UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                                  :

ARTHUR J. RIEL,
                                  :

                Plaintiff,       :        06 CV 524 (TPG)

          - against -          :        **OPINION**
                                    :

MORGAN STANLEY and MORGAN
STANLEY & CO., INC.               :

           Defendants.     :
------------------------------------------x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 2/16/07

    This case, brought by Arthur J. Riel against Morgan Stanley & Co. and its parent company Morgan Stanley, arises out of Morgan Stanley & Co.'s termination of Riel's employment. He was employed by Morgan Stanley & Co. from September 2000 until September 2005 as the Executive Director of Morgan Stanley & Co.'s Law IT Department. For the remainder of this opinion, Morgan Stanley and Morgan Stanley & Co. will be referred to collectively as Morgan Stanley or defendants.

    Riel has asserted eight causes of action against Morgan Stanley under New York law: three breach-of-contract claims, defamation, fraud/misrepresentation, negligent misrepresentation, negligence and prima facie tort. Defendants have moved under Federal Rules 9(b) and

12(b)(6) to dismiss all but count three of the complaint (one of the breach-of-contract claims).

Count three of the complaint alleges that Morgan Stanley breached its Executive Incentive Compensation Plan by firing Riel for cause, in bad faith, with the effect of depriving him of stock and options.

For the reasons stated below, this court grants defendants' motion and dismisses counts one, two, four, five, six, seven and eight of the complaint.

## **The Complaint**

For the purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the allegations set forth in the complaint are assumed to be true. Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d. Cir. 2006). The following is a summary of the allegations in the complaint, the truth of which is assumed.

As a Morgan Stanley employee, Riel signed and was subject to Morgan Stanley's Code of Conduct ("COC") and Code of Ethics ("COE"). The Codes state that their provisions form part of the terms and conditions of employment at Morgan Stanley.

One of Riel's principal responsibilities was the development of a searchable e-mail archive. In 2002, Riel and his team developed a retention system ("the Archive") that captured all e-mails coming in and out of Morgan Stanley. The Archive became operational on January 1,

2003, and from that point forward it continuously captured all of Morgan
Stanley's e-mails.  Several months later, software was developed to
search the Archive.

As part of the Archive project, Riel was additionally tasked with
uploading Morgan Stanley's pre-2003 e-mails onto the Archive.  This pre-
2003 material had been stored on various media at diverse locations.  As
part of this project, in or around May 2003, Riel learned that Morgan
Stanely's Storage Group had identified 39,000 backup tapes which likely
contained e-mails.  Later, in the spring of 2003, Riel was specifically
directed to upload pre-2003 e-mails from the 39,000 tapes.  As it later
turned out, 4,000 of those tapes did not contain e-mails.  In order to
upload those e-mails, the data had to be "harvested" from the backup
tapes.  The harvesting was done by Morgan Stanley's Storage Group and
an outside vendor.  Until the e-mails were harvested, Riel's Law IT team
had no access to or control over the e-mails contained on the tapes.

Sometime after the Archive began to operate (January 1, 2003),
Riel was instructed to design a Supervisory E-mail System that placed
randomly selected e-mails from the correspondence of a designated
group of individuals into a "mailbox" for review.  This system was
intended to allow Morgan Stanley to comply with SEC requirements that
certain supervisors review a portion of the e-mails that Morgan Stanley's
sales and trading staff sent outside Morgan Stanley or received from

- 3 -

outside.  The Supervisory System was completed in or around October
2003.

Riel was directed by Scott Rockoff, a Morgan Stanley in-house
lawyer, to test the Supervisory System by setting up a mailbox for e-
mails sampled from certain managing directors at Morgan Stanley,
including Guy Chiarello.  During the course of Riel's tests of the
Supervisory System, he came across "suspicious" subject lines in several
of Chiarello's e-mails.  They included solicitations by Chiarello for sports
tickets and offers of gifts from a Morgan Stanley vendor.

In November 2003, following up on the suspicious e-mails, Riel
reviewed Chiarello's e-mails from several dates in September and
October.  Those e-mails revealed additional offers of gifts from Morgan
Stanley vendors; a plan to influence the selection of a winner of the
"Computerworld Leadership Award," which Morgan Stanley sponsored, in
order to position Morgan Stanley to receive business from the winner;
and a list of companies from a senior Morgan Stanley banker from which
Chiarello was to obtain business by "leveraging" Morgan Stanley's IT
business.  In January 2004, believing the e-mails to be evidence of
misconduct in violation of Morgan Stanley's COC and COE, Riel
anonymously sent copies of the e-mails to Morgan Stanley's Chief
Financial Officer via interoffice mail with a post-it note that read: "Needs
investigation."

In 2004, Morgan Stanley was a defendant in Coleman (Parent)

Holdings, Inc. v. Morgan Stanley & Co., Inc., No. CA 03-5045 AI (Fla. Cir.

Ct.). The plaintiff in that suit sought discovery of Morgan Stanley e-mails

dating back to 1998. In April 2004, the Florida court ordered Morgan

Stanley to conduct a search of its e-mails, produce materials by May 16,

and certify, in writing, its compliance with the order.

At the time, the Storage Group was still engaged in harvesting the

pre-2003 e-mails from Morgan Stanley's backup tapes. In addition,

several weeks before the May deadline, the Storage Group became aware

of two additional sets of backup tapes that could contain pre-2000 e-

mails. One set consisted of 1,423 "DLT" backup tapes that were found in

a Morgan Stanley storage facility in Brooklyn. The other set consisted of

an unspecified number of older 8-millimeter backup tapes whose origin

is not identified in the complaint. The complaint is also unclear about

when Riel first learned of these newly-discovered tapes. However, on

June 7, Riel sent an e-mail to two Morgan Stanley in-house lawyers

notifying them of the existence of an additional 1,600 backup tapes and

that they could contain pre-2000 e-mails. Riel maintains that the 1,600

tapes that he referred to were the 1,423 Brooklyn tapes and the 8-

millimeter tapes. They were not put into the Archive at this time.

Following the issuance of the order in the Florida case, Morgan

Stanley in-house lawyers "provided Mr. Riel's Law IT team with the

parameters for one or more e-mail searches to be performed on the

Archive" to find responsive e-mails (Compl. ¶ 67) (emphasis added).  The complaint does not specify what those parameters were.  At some point, members of Riel's team performed the searches.  On May 14, Morgan Stanley produced e-mails in the Coleman case but did not provide the certification required by the court.  After Morgan Stanley was pressed for the certification, it was prepared on or about June 23.  At that time, James Doyle, an in-house lawyer brought the certification to Anush Danilyan, a junior member of Riel's team, for her to sign.  Danilyan brought the certification to the attention of her supervisor who, in turn, brought it to Riel.

In his complaint, Riel makes the following allegations concerning the certification:

> 73.  Mr. Riel had no specific information concerning the Coleman Litigation and only general information concerning the search that his Law IT team conducted on the Archive. Nor did Mr. Riel, a non-lawyer, have any understanding of Morgan Stanley's discovery obligations in the Coleman Litigation. Mr. Riel believed that the Certification operated as a confirmation that Morgan Stanley conducted a search of its Archive and that the responsive materials from that search were forwarded to Morgan Stanley's lawyers for production.

> 74. At the time, Mr. Riel had no understanding that he was certifying, in any sense, that *all* responsive e-mail from *any* Morgan Stanley source, including older back-up tapes, had been produced.

(Compl. ¶¶ 73-74) (emphasis in original).

Riel did not state in the complaint what the certification said. He neither quoted it in the complaint nor gave any indication of what was contained in the certification. Moreover, he did not provide the certification or any description of its contents in his papers on the present motion. A copy of the certification was furnished by defendant, and will be discussed later in this opinion.

Riel signed the certification, dated June 23, 2004. Nine days later, on July 2, Riel learned that the Brooklyn tapes indeed contained e-mail that dated back to 1998. On July 6, the Law IT team apprised Morgan Stanley's in-house lawyers of this fact by e-mail. Additionally, on July 8, Riel himself presented this fact to the lawyers.

The next month, on August 18, 2004, Riel was summoned to a meeting with his supervisor, Moira Kilcoyne, and a Human Resources representative, Tara Favors. At the meeting, he was asked whether he had seen e-mails of other executives. He was then informed that he would be placed on administrative leave with full pay and benefits while his conduct in scrutinizing the e-mails of Chiarello was investigated.

Two months later, in October 2004, the SEC contacted Riel at home requesting information concerning Morgan Stanley's e-mail retention practices. Riel cooperated, providing the SEC with, inter alia, information on Morgan Stanley's effort to harvest e-mails from its backup tapes, the Brooklyn tapes, and the 8-millimeter tapes. Then, in January 2005, the SEC issued a Wells notice to Morgan Stanley pertaining to

Morgan Stanley's e-mail retention practices.  A Wells Notice apprises the recipient that the SEC's Enforcement Division is close to recommending to the full Commission an action against the recipient and provides the recipient the opportunity to set forth his version of the law or facts. Carlson v. Xerox Corp., 392 F. Supp. 2d 267, 279 (D. Conn. 2005). According to Riel's complaint, in its response to the SEC, Morgan Stanley falsely claimed that, "Riel never informed the Law Division that any e-mail had been discovered on the 'found' tapes, despite his previous commitment to do so" (Compl. ¶ 89).

Later that year, on May 16, 2005, the Wall Street Journal published an article entitled, "How Morgan Stanley Botched a Big Case by Fumbling Emails."  This was about the Florida case.  Riel claims that Morgan Stanley attempted, in what it said to the Journal, to lay the blame on Riel for problems with the Florida court arising from the handling of e-mails in the document production.  The details of the Wall Street Journal article will be discussed later in this opinion.

Finally, on September 27, 2005, Morgan Stanley sent Riel a termination letter.  In it, Morgan Stanley stated that after conducting a "thorough investigation" it was terminating Riel for reading other employees' e-mails.  Morgan Stanley further stated that the termination was for cause.  Riel claims that this deprived him of 1,600 stock units and 5,000 vested stock options worth several hundred thousand dollars.

## **Discussion**

A court must dismiss a claim pursuant to Rule 12(b)(6) where a plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

During the course of this discussion, the court will set forth the language of the June 23, 2004 certification, the language of certain internal codes of Morgan Stanley, and a portion of the Wall Street Journal article. These present more than what is contained in the complaint. However, plaintiff surely relied on the certification, the codes and the Journal article in framing his complaint. Thus, the court is at liberty to present them in this opinion without converting the motion under Rules 9(b) and 12(b)(6) into a summary judgment motion under Rule 56. Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).

Each of plaintiff's causes of action at issue is examined below. But first it is appropriate to discuss the certification.

### **The Certification**

One of the pivotal events alleged in the complaint—if not the pivotal event—was Riel's signing of the June 23, 2004 certification. Riel claims that he was misled into signing it, that the certification was in fact false and that its presentation to the Florida court created a major problem for Morgan Stanley in that litigation. Riel claims that the fact

- 9 -

that he had signed the certification allowed Morgan Stanley to try to focus blame upon him.

Despite the importance of the certification to Riel's lawsuit, the complaint neither quotes the certification nor contains any description of what it said. This is not because the complaint is an abbreviated document lacking in details. It has an excess of details on many subjects. But on this most important subject there is a complete vacuum.

This omission was surely deliberate. What was said in the certification undermines the merits of Riel's case.

The following is the language of the certification, which was produced to the court by defendants:

### CERTIFICATION OF COMPLIANCE

I, Arthur Riel, hereby certify that Morgan Stanley & Co. and Morgan Stanley Senior Funding, Inc. complied with Paragraphs 1 and 2 of the April 16 Agreed Order on Coleman (Parent) Holdings Inc.'s Motion to Compel Concerning E-mails and Other Electronic Documents. The date of the backup utilized for each employee or former employee for whom e-mail was produced was January, 2000. The responsiveness and privilege review described in Paragraph 2 of the April 16, 2004 Agreed Order was conducted by counsel from Kirkland & Ellis LLP. It is my understanding that counsel from Kirkland & Ellis LLP produced all nonprivileged responsive documents on May 14, 2004 in compliance with the Court's order, and that a privilege log was subsequently provided.

Dated this 23rd day of June 2004.

- 10 -

By   /S/   Arthur Riel
Arthur Riel

Paragraph 73 of the complaint alleges that Riel, a non-lawyer, had no understanding of Morgan Stanley's discovery obligations in the Coleman litigation. However, the certification signed by Riel specifically states that Morgan Stanley has complied with Paragraphs 1 and 2 of the court order. Did Riel know what was in the court order? Did Riel assert that Morgan Stanley had complied with the court order without knowing whether or not it had done so? The certification asserts that the "date of the backup" used was January 2000. Paragraph 74 of the complaint alleges that Riel had no understanding that "older back-up tapes had been produced." The language of the certification is contrary to what is alleged in paragraph 74. Moreover, what is said in the certification is contrary to the basic position of Riel in the complaint, to the effect that all that he was required to search, and all that was actually being searched, were the e-mails in the Archive, as distinct from anything beyond the Archive, such as backup tapes.

The certification appears to distinguish Paragraph 1 of the April 16 order from Paragraph 2, and assign responsibility for Paragraph 2 to Kirkland & Ellis. Did Riel sign the certification without knowing anything regarding what Kirkland & Ellis had been responsible for and what search, if any, that firm performed?

- 11 -

## Counts 1-2: Breach of Contract

Plaintiff asserts two breach-of-contract claims based on the COC

and the COE. The complaint identifies the following passages from the

Codes as creating contractual rights:

> The Firm seeks to outperform its competition fairly and honestly through superior performance. Every employee, officer and director must therefore always keep the best interests of the Firm's clients paramount and endeavor to deal fairly with suppliers, competitors, the public and one another. No one should take unfair advantage of anyone through manipulation, abuse of privileged information, misrepresentation of facts or any other unfair dealing practice. (COE, p.1).
>
> During litigation, an internal investigation or a governmental, regulatory or administrative inquiry involving the Firm, you may be asked to provide information, including documents, testimony or statements to Law, Compliance, the Firm's outside counsel, or a governmental, regulatory or administrative authority. You may also be asked to meet with these entities or persons. As a term and condition of your employment, you must cooperate fully with any such request, in coordination with Law or Compliance, and you must provide truthful information. (COC, p.17).
>
> The firm has a responsibility under the law to communicate effectively so that the public is provided with full and accurate information in all material respects. To the extent that you are involved in the preparation of materials for dissemination to the public you should be careful to ensure that the information in these materials is truthful, accurate and complete. (COE, p.4).
>
> Employees, officers and directors are expected to cooperate in internal investigations of allegations

> of violations of the Code, and actual violations
> may subject you to the full range of disciplinary
> action by the Firm. (COE, p.5).
>
> Morgan Stanley will not tolerate any kind of
> retaliation for reports or complaints regarding
> the misconduct of others that were made in good
> faith. (COE, p.5).

Count 1 of the complaint alleges that Morgan Stanley breached the first, second and third passages by providing a false certification to Riel to sign and by intentionally providing allegedly inaccurate information to the Coleman court, the SEC, and the Wall Street Journal.

Regarding the false certification, Riel alleges (again, without quoting or describing the contents of the certification) that defendants breached the Codes by having him certify to the Coleman court that all responsive e-mails from any Morgan Stanley source had been produced in that case. Riel alleges that defendants knew that he couldn't truthfully make such a certification because he could attest only to the contents of the Archive (Compl. ¶ 74).

With respect to intentionally providing inaccurate information to the Florida court, Riel alleges that defendants wrongfully attempted to blame him for their own discovery abuse. He specifically alleges that after Morgan Stanley disclosed to the Florida court that it had located additional backup tapes in November 2004, Coleman moved for an adverse inference sanction. In response to that motion, Morgan Stanley told the court that "Riel failed to design an Archive that could produce e-mails in a timely fashion" and that its in-house lawyers did not know

about the additional backup tapes until late 2004.  Morgan Stanley further stated to the court that Riel knew of the tapes but "concealed their existence" from Morgan Stanley's in-house lawyers (Id. ¶ 90).

The Florida court praised Riel as a "whistleblower" in connection with the SEC's investigation into Morgan Stanley's e-mail-retention practices.  Nevertheless, in April 2005, one of Morgan Stanley's in-house lawyers prepared a false offer of proof for Riel to sign that placed the blame for Morgan Stanley's e-mail production debacle on Riel.  The offer of proof falsely asserted that Riel believed that he had searched Morgan Stanley's oldest tapes by using the Archive and that he failed to alert Morgan Stanley about the existence of e-mails on the "found" backup tapes.  Riel refused to sign the offer of proof (Id. ¶¶ 91-92).

Regarding the provision of inaccurate information to the SEC, Riel alleges that Morgan Stanley told the SEC that e-mails from the Brooklyn tapes were uploaded onto the Archive before he was placed on administrative leave.  Additionally, Morgan Stanley told the SEC that Riel never told their in-house lawyers that e-mail had been discovered on the Brooklyn tapes and that Morgan Stanley was unaware of them until October 2004 (Id. ¶¶ 87-89).

As indicated earlier, Riel claims that Morgan Stanley made various false statements to the Wall Street Journal attempting to blame him for the problem with the Florida court (Id. ¶¶ 95-99, 139-145).

- 14 -

Count 2 of the complaint alleges that Morgan Stanley breached the first, second, fourth, and fifth passages by placing Riel on administrative leave "in order to control and manipulate the SEC's access to him, and to prevent the disclosure of the facts behind Defendants' deficient production in the course of the Coleman litigation" (Id. ¶ 127). Defendants told Riel that they were placing him on administrative leave in order to investigate his e-mail monitoring activities. However, no investigation was ever conducted.

"Routinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements." Lobosco v. N.Y. Tel. Co./NYNEX, 96 N.Y.2d 312, 317 (2001). Nevertheless, employee manuals and handbooks can operate as employment contracts if they clearly impose duties on an employer vis-à-vis employees and if an employee relies on such a commitment in accepting or continuing employment. Baron v. Port Auth., 271 F.3d 81, 85 (2d Cir. 2001). In the present case there is no such thing.

The first quoted passage, from the COE, is designed to prevent unfair dealing by employees of Morgan Stanley vis-à-vis other employees, by means of misrepresentation of facts or by other means. The second passage, from the COC, admonishes Morgan Stanley employees to provide truthful information during investigations and litigation. The third passage, from the COE, states that Morgan Stanley employees must be truthful in disseminating information to the public. The fourth, also

- 15 -

from the COE, states that employees must cooperate in internal investigations. Riel alleges that Morgan Stanley violated all of these requirements.

But these requirements are imposed by Morgan Stanley on its employees. There is nothing in those provisions that constitutes a contractual promise or commitment by Morgan Stanley. If one employee violates a code requirement, there is nothing that makes Morgan Stanley contractually liable for that violation, as if Morgan Stanley were some kind of a guarantor of the performance of these code obligations imposed on employees.

It is true that the fifth passage, from the COE, does refer to Morgan Stanley not tolerating any kind of retaliation for reporting misconduct. But this is not a contractual promise on the part of Morgan Stanley. It is simply another way of stating that certain kinds of conduct by Morgan Stanley employees are forbidden.

An additional point should be made regarding the claim that Morgan Stanley breached a contractual obligation to Riel in connection with the certification. As described earlier, Riel's pleading with respect to the certification must be regarded as basically a nullity. Moreover, the language of the certification basically contradicts a fundamental position of plaintiff in the litigation. Therefore, the complaint makes no legally cognizable allegation of any cause of action based on the certification.

Counts 1 and 2 are dismissed.

## **Count 4: Defamation**

The complaint alleges that during the spring of 2005 Morgan
Stanley was receiving harmful media coverage and that an article
appeared in the Wall Street Journal which "was part of Morgan Stanley's
public relations campaign to cover up its misdeeds and to defame and
malign Mr. Riel" (Compl. ¶ 95). The article was entitled "How Morgan
Stanley Botched a Big Case by Fumbling Emails" and was printed on
May 16, 2005. The complaint asserts that Morgan Stanley made
statements to the Journal which were printed in the article (id. ¶ 97),
and that these statements were false and defamatory (Id. ¶ 140).

The Wall Street Journal article has been furnished to the court as
an exhibit to Riel's declaration on this motion. It was a long article,
discussing many litigation and regulatory problems of Morgan Stanley in
addition to the Coleman case. The article had this to say about Riel and
the document search carried out under court order:

> The task of overseeing the search fell to
> Mr. Riel, then head of Morgan Stanley's
> technology compliance group. Morgan Stanley
> says Mr. Riel was overseeing a multimillion-
> dollar project to put nearly 300 million emails
> into an easily searchable archive. Previously,
> Morgan Stanley stored emails on magnetic
> tapes. Morgan Stanley says Mr. Riel thought he
> project was mostly done and searched only the
> new database.
>
> By early May at the latest – before Morgan
> Stanley sent emails to the Perelman team –
> somebody at the firm unearthed 1,423
> computer-backup tapes in a closet in a Brooklyn
> office building. They hadn't been entered into

the archive and no one had looked at them by this point, according to court testimony.

In mid-May, Morgan Stanley sent 1,300 emails to Mr. Perelman's attorneys but didn't include the required certification. It wasn't until early June that Mr. Riel told two Morgan Stanley lawyers, Soo-Mi Lee and James Cusick, about the recently discovered Brooklyn tapes – at the time, he mistakenly said there were 1,600. Mr. Riel told the lawyers he would perform a search and let them know if they contained relevant email.

A couple of weeks later, Mr. Riel signed the certification, although the new tapes had not been searched, according to the judge's written order. In the certification, Mr. Riel said the oldest available tape was dated January 2000. In fact, Mr. Riel and his team determined by early July that the newly discovered tapes went back to the late 1990s, the period at issue in the suit. Morgan Stanley didn't disclose that discovery until November, according to court documents.

Mr. Riel's attorney, Jeffrey Pigano,[1] says his client believed the certification only covered the archive, his area of responsibility, not tapes that hadn't yet been entered into it. In his deposition, Mr. Riel said: "I knew the litigators – my internal clients – needed certification . . . and I wanted to satisfy that concern."

A Morgan Stanley spokesman says that in general only a small fraction of its tapes contain email and that it didn't know whether the newly discovered tapes did so. As a result, the firm didn't believe it was obligated disclose [sic] them when Mr. Riel signed the certification.

In August, Morgan Stanley says it placed Mr. Riel on administrative leave for reasons unrelated to the Perelman case. The firm

---

[1] The article misspelled his name, which is "Pagano."

> accused him of looking through co-workers'
> email in violation of company policy. Mr. Pigano
> says that explanation is "materially misleading."
> The attorney notes that his client was called a
> "whistleblower" by Judge Maas in connection
> with a separate SEC investigation into Morgan
> Stanley's relationships with third-party vendors.
> Morgan Stanley says "an initial internal
> investigation of [Mr. Riel's] allegations found no
> breach of law, regulation, or policy."

The article goes on to narrate increasing difficulties Morgan

Stanley had with the Florida court after Riel's duties were transferred to

another Morgan Stanley employee.

Out of this detailed and lengthy discussion, the complaint in this

case singles out only small portions as constituting the alleged

defamatory statements:

> 96. The Article falsely reported that Morgan
> Stanley stored its old e-mails "on magnetic
> tapes" and that in 2004, in the wake of the
> agreed Order in the Coleman Litigation, "[t]he
> task of overseeing the search fell to Mr. Riel,
> then head of Morgan Stanley's technology
> compliance group." In reality, Mr. Riel had no
> control over any backup tapes.

> 97. Morgan Stanley and its agents provided the
> Wall Street Journal with several statements
> concerning Mr. Riel.    Upon information and
> belief, the Wall Street Journal faithfully printed
> the information that Morgan Stanley provided.
> First, Morgan Stanley falsely stated that "Mr.
> Riel was overseeing a multimillion-dollar project
> to put nearly 300 million emails into an easily
> searchable archive." In reality, neither Mr. Riel
> nor anyone on his Law IT team handled backup
> tapes.    In addition, as the Article stated:
> "Morgan Stanley says Mr. Riel thought the
> project was mostly done and searched only the
> new database."

The complaint goes on to say that when Riel signed the certification Riel knew that the Brooklyn tapes had only recently been found and that they were not yet in the Archive.  The claim is that Morgan Stanley wanted to "create the false impression" that the Brooklyn tapes were in, or on the verge of being in, the Archive and that Riel was responsible for not producing them (Compl. ¶ 98).  Also, Riel claims that the passage about administrative leave was false and defamatory.

> 99. In addition, in the May 16, 2005 Article, Morgan Stanley asserted that Mr. Riel had been placed on administrative leave in August 2004 "for reasons unrelated to the Perelman case." Morgan Stanley's statement was materially false at the time it was made, and it was intended to discredit Mr. Riel  .  .  .  .  Morgan Stanley's objective was to delay or prevent uploading of e-mail from the Brooklyn tapes into its searchable Archive, to avoid production of relevant e-mail to the Florida Court an to limit contact with SEC.

The following is a list of the statements in the Wall Street Journal article alleged to be false and defamatory:

(1) that Morgan Stanley stored its old e-mails on magnetic tapes;

(2) that the task of overseeing the court-ordered search fell to Riel;

(3) that Riel was overseeing a multi-million dollar project to put nearly 300,000,000 e-mails into an easily searchable archive;

(4) that Riel thought that the multimillion dollar project was mostly done and searched only the new databases;

(5) that Riel was placed on administrative leave for reasons unrelated to the Perlman case.

It is difficult to consider the Wall Street Journal article as defamatory as to Riel when Riel only complains about a few general statements and makes no objection to the description of the specifics of his conduct. However, it is appropriate to deal with the items that Riel claims to have been defamatory statements.

Items (1) and (3) can be disposed of quickly. They were not of a defamatory character, and, in any event, at least item (3) was true according to the complaint. It is true that Riel was in charge of the large project to create the archive. The 300,000,000 may be exaggerated, but Riel does not complain about this.

This leaves items (2), (4) and (5) as arguably defamatory statements.

Defendants argue that any alleged defamatory statements are privileged under section 74 of the New York Civil Rights Laws. Section 74 provides that a "civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." The protections of section 74 extend to pleadings, transcripts, live proceedings and the release by the parties of background material regarding their positions in the case. Branca v. Mayesh, 476

- 21 -

N.Y.S.2d 187, 188 (App. Div. 2d Dep't 1984), aff'd, 63 N.Y.2d 994 (1984); Fishof v. Abady, 720 N.Y.S.2d 505, 506 (App. Div. 1st Dep't 2001).

It also appears from the face of the article that the reporting was largely based on court records. However, the complaint asserts that defamatory statements were made by Morgan Stanley to the Wall Street Journal. For the purposes of this motion, that will be assumed to be the case. Nevertheless, if Morgan Stanley reported to the Journal what is contained in court records, such reporting is within the express terms of section 74. See El Greco Leather Prods. Co., Inc. v. Shoe World, Inc., 623 F. Supp. 1038 (E.D.N.Y. 1985).

Defendants have demonstrated that the alleged defamatory statements were based on statements made in depositions, hearings, and declarations in the Coleman litigation.[2] For example, in support of the statement ascribing the responsibility for performing the search for e-mails to Riel (item (2) above), Robert Saunders, an Executive director in Morgan Stanley's IT division, testified in his deposition that his "general understanding of the search process was that a combination of Arthur Riel's group and IT security were responsible for carrying out searches in

[2] On a motion to dismiss, the court may consider "matters of which judicial notice may be taken," without converting the motion into one for summary judgment. Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). And under Fed. R. Evid. 201(b), a court may take judicial notice of a public record. Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000). Thus, the declarations and hearing transcripts relied on by Morgan Stanley may be considered by this court as public records in the Florida court. Additionally, since the depositions cited by Morgan Stanley were admitted by the Florida court as evidence, they too are part of the public record and are matters of which judicial notice may be taken.

- 22 -

the e-mail archive to look for discoverable documents in such a case as

this." (Saunders Dep. 46:13-17, Feb. 10, 2004).

Item (4) is the statement in the <u>Journal</u> article that in effect said

that Riel felt justified in searching only the "new database"—i.e., the

Archive, because he believed that the multimillion dollar project was

mostly completed.  Support for this statement can be found in the

argument of Morgan Stanley attorney Jeff Davidson at a March 15, 2005

hearing:

> Remember Mr. Riel—Mr. Riel's understanding, . . . the
> historic side of the e-mail restoration process was that the
> oldest backup tapes were to be migrated on to the archive
> first. And so by the time you get to the June time frame, Riel
> is sitting there thinking that the oldest tapes are already on,
> that, therefore, we've got a high degree of confidence that the
> oldest available backup tape for each one of the 36 people is
> there.   And that, therefore, that would automatically be
> searched as—whatever e-mails were on there would
> automatically be searched through the archive system.

(Hr'g Tr. vol. 37, 3865, Mar. 15, 2005).

It is also necessary to return to the point regarding the role of the

certification in the complaint. As described above, part of the defamation

claim is that, as Morgan Stanley knew, when Riel signed the certification,

he was aware that the Brooklyn tapes had only recently been found and

was further aware that they had not become part of the Archive, but

Morgan Stanley released its statement to the <u>Journal</u> in order to create

the false impression that the Brooklyn tapes had been, or were about to

be, moved into the Archive and that Riel was responsible for their not

being produced (Compl. ¶ 98).  But this claim is pled without any

description of the actual certification, and is entirely insufficient for this reason.

Finally, in support of the statement regarding the reason for placing Riel on administrative leave (item (5)), defendants point to both the declaration of Joanne Ceriello, an Executive Director in Morgan Stanley's Human Resources Department, submitted to the Florida court in February 2005 and Riel's own deposition.  Ceriello declared: "On August 19, 2004, Arthur Riel was placed on administrative leave after an employee reported to one of my staff members and others that Riel was inappropriately accessing the contents of other employees' e-mail and data." (Ceriello Decl., Feb. 23, 2005).  Moreover, when asked about the reasons for being placed on administrative leave Riel testified that: "My understanding is it's related to an investigation of unauthorized e-mail inquiries on senior managers." (Riel Dep. 16:10-12, Mar. 8, 2005).

Therefore, all of what is reported in the article can be found in court records and is privileged under section 74.  The fact that the Wall Street Journal may have been told of these matters by Morgan Stanley does not make the section 74 privilege inapplicable as long as what was said is contained in court records.  El Greco, 623 F. Supp. 1038.

Riel raises two challenges to the application of section 74 privilege in this case: (1) the defamation alleges more serious conduct than that alleged in the litigation, and (2) application of the privilege in this case

would arrive at an "unreasonable or absurd result" contrary to the statutory purpose of section 74.

Although not specifically identified as such, Riel's first argument essentially denies that the article was a "fair and true" report of the Coleman litigation. In order for a report to be "fair and true" under section 74, it must be "substantially accurate." Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 67 (1979). Riel argues that the newspaper report alleges more serious conduct than that alleged in the litigation. Notably, he fails to cite even one example of what he means by "more serious conduct." In contrast, as described above, defendants have identified statements made in various depositions, hearings and declarations in the Coleman litigation supporting each of the alleged defamatory statements. Since each statement in the Wall Street Journal article is a substantially accurate report of statements in the record in the Coleman case, Riel's first argument fails.

Riel's second argument relies on an exception to the privilege created by the New York Court of Appeals in Williams v. Williams, 23 N.Y.2d 592 (1969). There, the Court of Appeals held that the section 74 privilege does not apply where a litigant "maliciously institute[s] a judicial proceeding alleging false and defamatory charges, and . . . then circulate[s] a press release or other communication based thereon." Id. at 599. The court reasoned that the purpose of the privilege "is the

- 25 -

protection of reports of judicial proceedings which are made in the public interest," and to protect defamatory statements made in a litigation whose sole purpose is to provide cover for such defamation would be contrary to that purpose, leading to an "unreasonable and absurd result." Id.

Riel argues for the application of the Williams exception because defendants submitted perjurious declarations in the Coleman case relating to their knowledge of the existence of backup tapes by certain dates. However, New York courts have consistently held that the Williams exception is a narrow one, see, e.g., Cuthbert v. Nat'l. Org. for Women, 615 N.Y.S.2d 534, 535 (App. Div. 3d Dep't 1994), and does not apply "in the absence of any allegation that the . . . action was brought maliciously and solely for the purpose of later defaming the plaintiff." Branca v. Mayesh, 476 N.Y.S.2d at 189. Defendants did not bring the Coleman action, and the Williams exception does not apply.

Count 4 is dismissed.


## Count 5: Fraud/Misrepresentation

This count alleges that, in or about the middle of 2004, Morgan Stanley embarked upon a scheme to avoid its obligations under the Florida court order, and to prevent Riel from giving truthful information in the litigation and to the SEC. According to the complaint, Morgan

- 26 -

Stanley made two misrepresentations of material fact to Riel, in order to
effectuate their wrongful plan:

> (a) The first incident occurred on or about June 23, 2004,
> when defendants provided him with the certification for him
> to sign in accordance with an order in the Coleman case. He
> alleges that defendants represented to him that it was an
> accurate description of what Morgan Stanley had produced
> in that case and that he could legitimately sign the
> certification, despite the fact that defendants knew at the
> time that the certification was "false and materially
> misleading."
>
> (b) The second occurred when defendants informed Riel that
> they were placing him on administrative leave in order to
> conduct an investigation into his e-mail monitoring
> activities. Riel alleges that defendants knew at the time that
> no investigation would be conducted.

(Compl. ¶ 147).

With respect to the administrative leave issue, Riel alleges that he
relied on the idea that there would be an investigation and that this led
him to remain on administrative leave and neglect to pursue other
business opportunities (Id. ¶¶ 148-150). Riel alleges that he has
sustained "economic and other injuries in the sum of no less than $1
million" (Id. ¶ 152). The nature of these injuries is not specified except

for a vague, and completely undefined, reference to "damage to his reputation" (Id. ¶ 150).

On the question of whether count 5 states a valid cause of action, the court returns to the fact that Riel has failed to plead what the certification actually said.  Thus, the essential element of any cause of action based on the certification is missing.  Moreover, the actual language of the certification contradicts a basic position of plaintiff in this case.

As to the administrative leave allegation, there is no sufficient allegation of any injury resulting from the claimed misrepresentation.  There is no definition of how Riel's reputation was harmed by the mere fact that he was put on administrative leave.  There is nothing indicating any actual lost employment opportunities.  Although there is a kind of hint to this effect, there is no express allegation that Riel, had he known the "true facts," would have resigned from Morgan Stanley, rather than holding on until he was discharged, and would have found new employment during the period of administrative leave.  The pleading in count 5 is a mere suggestion of some speculative possibility, rather than an allegation of a concrete injury.

Count 5 is dismissed.

## **Count 6: Negligent Misrepresentation**

Riel's negligent misrepresentation claim arises from defendants' representation that they would conduct an investigation into his e-mail monitoring activities. Riel claims that defendants negligently failed to disclose that they had no intention of conducting such an investigation.

To state a claim for negligent misrepresentation under New York law, a plaintiff must allege: (1) a special relationship between plaintiff and defendant that creates a duty for defendant to impart correct information to plaintiff; (2) the information given was false; and (3) plaintiff's reasonable reliance upon the information given by defendant. Hudson River Club v. Consol. Edison Co. of N.Y., Inc., 712 N.Y.S.2d 104, 106 (App. Div. 1st Dep't 2000).

A "special relationship" may be shown by alleging either (1) that the person making the representation held or appeared to hold unique or special expertise, or (2) that a special relationship of trust or confidence existed between the parties. Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d. Cir. 2001) (citing Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996)).

Riel has alleged no fact permitting even an inference that defendants held or appeared to hold special expertise, nor that there existed a special relationship of trust or confidence between himself and defendants. Riel has alleged nothing more than an ordinary employer-employee relationship.

- 29 -

Count 6 also fails because of the failure to plead injury. The discussion of this subject as to count 5, applies also to count 6.

Count 6 is dismissed.

## Count 7: Negligence

Riel's negligence claim arises from defendants' undertaking to conduct an investigation into his e-mail monitoring activities and their alleged failure to proceed with the investigation. Whatever Morgan Stanley did or did not do with regard to investigating Riel's e-mail monitoring activities, does not give rise to a cause of action for negligence.

Count 7 is dismissed.

## Count 8: Prima Facie Tort

Riel's prima facie tort claim alleges that all of defendants' statements and conduct were without excuse or justification and were motivated solely by their intention to inflict harm on him.

To properly claim prima facie tort under New York law, a plaintiff must allege: (1) intentional infliction of harm; (2) causing special damages; (3) without excuse or justification; and (4) by an act, or series of acts, that would otherwise be lawful. Curiano v. Suozzi, 63 N.Y.2d 113, 117 (1984). In order to satisfy the third element, a plaintiff must allege that that the conduct complained of was done with "disinterested

malevolence"—i.e. with the sole intent to harm. Liberty Mut. Ins. Co. v. York Hunter, Inc., 945 F. Supp. 742, 749 (S.D.N.Y. 1996).

Defendants argue that since Riel alleged that defendants' actions were motivated, at least in part, by their own interests—i.e. to control him and cover up their own alleged misdeeds—Riel has failed to allege disinterested malevolence. Riel responds that he is merely pleading prima facie tort as an alternative theory.

Riel cites four cases to support his argument that he may plead prima facie tort as alternative relief. See Hughes v. Patrolmen's Benevolent Ass'n, 850 F.2d 876 (2d Cir. 1988); Sadowy v. Sony Corp., 496 F. Supp. 1071 (S.D.N.Y. 1980); Freihofer v. Hearst Corp., 65 N.Y.2d 135 (1985); Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397 (1975). However, all of the cited cases are inapposite. Each of them contains allegations by the plaintiff that the conduct complained of resulted solely from an intention to cause harm to the plaintiff. Where, as here, a plaintiff pleads motives other than sole intent to harm the plaintiff, a claim for prima facie tort must be dismissed.

Count 8 is dismissed.

**Conclusion**

For the foregoing reasons, defendants' motion to dismiss is granted and counts one, two, four, five, six, seven and eight of the complaint are dismissed.

SO ORDERED

Dated: New York, New York
       February 16, 2007

Thomas P. Griesa
U.S.D.J.